# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 7, 2014

## STATE OF TENNESSEE v. GERALD MCEWEN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-00466     Paula Skahan, Judge**

---

**No. W2013-02692-CCA-R3-CD  - Filed April 29, 2015**

---

A Shelby County Criminal Court Jury convicted the appellant, Gerald McEwen, of first degree premeditated murder and attempted first degree murder. The trial court imposed a total effective sentence of life imprisonment in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence sustaining his convictions and contends that the trial court erred by denying his motion for a mistrial. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Robert Parris (at trial and on appeal) and Carolyn Sutherland (at trial), Memphis, Tennessee, for the appellant, Gerald McEwen.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General, and Jennifer Nichols and Betsy Carnesale Wiseman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

In 2007, the appellant was indicted for the first degree murder of Nicholas Harris and the attempted first degree murder of Darren Champion. The charges resulted from a shooting that occurred in the parking lots of a First Tennessee Bank and a Mapco gasoline

station, which were located on Hollywood Street in Memphis. The case proceeded to trial, and the appellant was convicted as charged. On appeal, this court affirmed the appellant's convictions. See State v. Gerald McEwen, No. W2009-00309-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 841, at *1 (Jackson, Sept. 24, 2010). Subsequently, the appellant filed a petition for post-conviction relief. The petition was granted by the trial court, and the appellant was afforded a new trial, which is the subject of the instant appeal. On appeal, the appellant contends that the evidence was not sufficient beyond a reasonable doubt because the proof was based primarily on unreliable eyewitness testimony and that the trial court erred by denying the appellant's motion for a mistrial.

At trial, Earnestine Harris testified that one of the victims, Nicholas Harris (hereinafter "Harris"), who was also known as Nicholas Powell, was her stepson. Harris was born on August 10, 1984. In June 2004, Harris was shot in the neck and was paralyzed from the neck down. Additionally, Harris was unable to speak because "he had a trach in him." After Harris left the hospital, he was moved to a nursing home where he remained until July 22, 2005, when he passed away. At the time of his death, Harris had four brothers and a three-year-old daughter.

Ladarius Weathersby testified that in 2004, he was eighteen years old, he lived in the Frayser area, and he was friends with Darren Champion, Corry Selmon, Christopher Williams, Robert Wordlow, and Kevin Swannigan. Around 9:00 or 10:00 p.m. on June 12, 2004, Weathersby, who was in a black, four-door Maxima, drove Wordlow and Swannigan to Club Flippers, which was located on Hollywood Street. Weathersby did not want to go in the club, so he went to his girlfriend's house.

Later that night, Wordlow called Weathersby and asked for a ride home. Weathersby agreed and drove to the club. However, because there were fights in the parking lot, security and police officers would not let him enter the lot, and he parked in First Tennessee Bank's lot across the street. Weathersby's car was the first one in the exit lane so that he could easily turn onto the street. After he parked, he called and informed Wordlow of his location.

Weathersby saw Wordlow and Swannigan exit the club and walk across the street to the bank. When they reached the bank's parking lot, Swannigan got into the backseat of Weathersby's car, and Wordlow began talking loudly to someone who was standing approximately three cars behind Weathersby. The windows of Weathersby's car were up, and he could not hear what was said. A few seconds later, Weathersby heard a gunshot. He looked behind him and saw the shooter, whom he identified in court as the appellant,

repeatedly firing toward the Mapco gasoline station located beside the bank.[1]  At the time of the shooting, Weathersby did not know the appellant's name.  Weathersby said that after the third or fourth shot, Wordlow got into Weathersby's car, and they drove away.  Weathersby estimated that he heard seven to ten shots.

Weathersby said that he drove Wordlow and Swannigan to Wordlow's mother's house; the men did not talk during the drive.  Weathersby did not go directly home but continued to drive to calm his nerves.  While he was driving around, a friend called and informed him that Darren Champion, a friend with whom Weathersby attended school, had been shot.  Weathersby went to the hospital to check on Champion and learned that he was in critical condition.  Thereafter, Weathersby discovered that Champion had recovered. Later, Weathersby saw Champion at school, and they talked about the incident.

Sometime after the shooting, Weathersby asked Wordlow who the shooter was.  Wordlow responded that it was "his god brother or his brother, as he called him."  Wordlow said that the shooter's nickname was "Q."

In August 2005, the police contacted Weathersby.  At that time, he learned that Harris, whom he had not known prior to the incident, had been injured.  Upon looking at a photograph lineup, Weathersby immediately identified the appellant as the shooter, stating that he was certain of the identification.  Weathersby told the police that at the time of the shooting, the appellant was standing near a green Dodge Stratus.  Sometime after the shooting, Weathersby learned that on the Saturday prior to the shooting, Wordlow had been "jumped" at a pool party in Raleigh; however, neither Weathersby nor Wordlow knew the identity of the assailant.

On cross-examination, Weathersby said that he left Wordlow and Swannigan at the club around 10:00 p.m. and that Wordlow called around midnight to request a ride home.

Weathersby said that he gave a statement to the police on August 10, 2005.  He acknowledged that in his statement, he said that he picked up Wordlow and Swannigan at the club, dropped them off at Mapco, then parked at First Tennessee Bank as Wordlow had instructed.  However, at trial Weathersby asserted that he told Wordlow that he could not pick them up at Mapco and that he was already parked at the bank.  Weathersby also said that he did not want to go to Mapco because of the fights.  Weathersby recalled that Wordlow got

---

[1]An aerial photograph that was an exhibit at trial reveals that the bank and the gas station were located on the same side of the street.  The photograph further reveals that, based upon Weathersby's testimony that his car was in the exit lane of the bank's parking lot facing the street, the gas station was located to the left of Weathersby's car.

into the car after the shooting started. Weathersby said that although the shooting occurred around midnight, the area was well-lit, and he could see clearly.

Weathersby acknowledged that he spoke with an investigator employed by the appellant but denied telling the investigator that he was drunk when he spoke with the police or that he would not recognize the shooter if he saw him on the street. Weathersby told the investigator that he did not know anything because he did not want to be involved and did not like talking about the shooting.

Robert Wordlow testified that he graduated from high school in 2004 and that he had attended school with Weathersby, Swannigan, Champion, and Selmon. Wordlow knew the appellant, who was older than he, from the neighborhood, and they would sometimes "hang out" together. He did not believe the appellant knew Weathersby, Swannigan, Champion, Selmon, or Harris. Wordlow did not know Harris until after the shooting.

Wordlow said that sometime between the end of school and the second week in June 2004, he and his friend Mike attended a pool party hosted by a girl named Georgina. After Wordlow arrived, a fist fight began on the street. Wordlow tried to break up the fight because some of the people attending the party, one of whom was Champion, surrounded Mike's car and tried to pull Mike out of the car. While trying to stop the fight, Wordlow was hit in the head twice. After the altercation, Wordlow got back into Mike's car, and they left. Wordlow did not recall whether he told the appellant about the altercation but asserted that the appellant knew of the incident. After the pool party, Wordlow and Champion exchanged messages via Karen Minor. Wordlow said that he and Champion were not fighting, but "there was a little bit of something going on between" them.

Wordlow said that on June 12, 2004, Weathersby, who was driving a light green car, drove Wordlow and Swannigan to Club Flippers; however, Weathersby did not go inside with them. Wordlow explained that the club was located on Hollywood Street behind a strip mall directly across the street from First Tennessee Bank and Mapco. Wordlow recalled that it was dark and "kind of late" when they arrived at the club. Wordlow saw Champion inside the club, but they did not argue.

Wordlow recalled that the club closed early and that he called Weathersby, who agreed to give them a ride home. When Wordlow exited the club, he saw the appellant in the club's parking lot. He told the appellant he was going to the bank's parking lot to "get to the bottom of everything that happened" with Champion at the pool party. The appellant said that he would go with Wordlow and Swannigan, and they walked across the street.

Woodlow gave conflicting statements about where Weathersby was parked. He

initially stated that he could not recall, then that Weathersby's car was the first one parked in the exit lane of the bank's parking lot, and finally that Weathersby was parked at Club Flippers. Wordlow also stated that at some point, he, Weathersby, and Swannigan drove to Mapco, but his testimony was unclear as to when.

Wordlow said that Weathersby's car was parked facing the street and that the appellant was behind them, standing beside a dark green car. Champion was in the bank's parking lot, walking away from the Mapco and toward Wordlow. Wordlow was sitting on the front passenger side window of Weathersby's car, half in and half out of the car. Wordlow heard angry "words being exchanged" between the appellant and Champion but could not make out what they said. The appellant then fired a weapon toward Champion. Wordlow could not recall how many shots were fired but knew it was more than three. When the shooting started, Wordlow slid inside the car. Weathersby turned right onto the street and drove Wordlow and Swannigan to Wordlow's mother's house.

Wordlow said that he started getting telephone calls from various people who thought he was the shooter. He told them he was not involved. Wordlow learned that Champion had been shot; however, he did not know about Harris's injuries until later.

Wordlow said that the police did not contact him immediately after the shooting. He said that he did not contact the police because he feared that some type of physical harm would befall him. After the shooting, the appellant told Wordlow that he shot Champion because Champion "had got smart with him. Something of that nature." Wordlow said that he felt responsible for the shooting because he thought it occurred as a result of his altercation with Champion at the pool party. Wordlow lived with the appellant for a while after the shooting when Wordlow did not "have anywhere else to go."

Wordlow said that on August 10, 2005, thirteen months after the shooting, he was contacted by the police. Afterward, he went to the police station and gave a statement. He asserted that the statement was truthful and that he did not lie to avoid going to jail. While at the police station, he also looked at a photograph lineup, from which he identified the appellant as the shooter.

Wordlow acknowledged that "[l]ong after" he gave his statement, he was indicted for facilitation to commit first degree murder. He later pled guilty to the lesser-included offense of attempted aggravated assault and received a two-year sentence. He was granted judicial diversion, which he successfully completed, and the conviction was expunged.

On cross-examination, Wordlow said that he had consistently maintained that the appellant was the shooter.

-5-

Wordlow said that while he was at the club, he drank two or three alcoholic beverages and that he and Champion "exchanged looks." They did not speak, but Wordlow was "irritat[ed]" with Champion and wanted "[t]o get some type of understanding as to why the things that were being said, the things that was getting back to me, what was going on with it. . . . And if it would have went further, my furthest intention was to fight. I wasn't armed. I didn't have any weapon on me."

Wordlow said that after Weathersby picked up him and Swannigan, they first drove to Mapco then, because Wordlow saw Champion in the bank's parking lot, they drove to First Tennessee. Wordlow rolled down the window on the passenger's side and sat half in, half out of the car. Wordlow "yelled something over to [the appellant,] and he just up and start[ed] shooting." After the shooting began, Weathersby drove Wordlow home. Wordlow did not contact the police because he feared the appellant would harm him. He acknowledged that one or two months later, he moved in with the appellant. He explained, "There was no bad blood between us at that time."

Wordlow acknowledged that he gave a statement to the police on August 10, 2005. In his statement, he did not mention that Swannigan was present that night; however, he stated that he and Weathersby met the appellant at Club Flippers.

Darren Champion, whose nickname was "Champ," testified that at the time of the shooting, he was seventeen years old. Champion said that on the night of June 12, he went to Club Flippers with Christopher Williams, Corry Selmon, and Derwin Mosby in Selmon's Dodge Stratus. Champion saw Wordlow and Weathersby in or around the club.

Champion said that he, Williams, and Selmon left the club sometime after midnight and drove across the street to Mapco. Because the parking lot was full, they had to park in First Tennessee Bank's lot. Champion and Williams went into the store and bought some juice. When they exited the store, Champion heard someone say, "[T]here go Champ," and then he was shot in the back.

Champion was transported to the hospital by ambulance, and he remained there for one week. He had two surgeries, one of which was to remove the bullet. His injuries included a pierced lung and a pierced liver. After surgery, Champion learned that Harris had also been shot. A little over a year later, Harris died as a result of injuries sustained during the shooting.

Champion said that he had attended a pool party a few weeks earlier. He heard that Wordlow had also attended the party and that a fight had broken out; however, Champion left before the fighting started. Champion did not know that Wordlow was upset with him

-6-

because of the incident at the pool party.

Champion said that he had never seen the appellant prior to the night of the shooting and that he did not see the shooter or know the direction from which the shots were fired. He recalled seeing Wordlow, Weathersby, and Swannigan in the bank's parking lot when Selmon parked there. Champion denied having a weapon on the night of the shooting.

On cross-examination, Champion said that he was only a few feet away from the store's front door when he was shot. He did not hear the shot; he only felt the heat from the bullet.

Corry Selmon testified that on the night of June 12, 2004, he drove Williams, Champion, Harris, and Mosby to Club Flippers in his Dodge Stratus. They arrived around 10:00 p.m. and parked in the club's parking lot. Inside the club, he saw Wordlow and Swannigan, but they did not speak to each other. After an hour and a half to two hours, he and his friends left the club and went to Mapco to purchase snacks. Selmon parked in First Tennessee Bank's lot next door to Mapco.

Selmon said that after making a purchase, he and Harris exited the store and walked back to his car, followed by Williams, Champion, and Mosby. Selmon saw Weathersby, Wordlow, and Swannigan in Weathersby's car in the bank's parking lot. He then heard gunshots. He saw the shooter standing beside Selmon's car, holding a handgun and firing in the direction of Selmon and his friends. Selmon heard approximately nine shots. When the shooting began, Selmon ran and jumped behind some bushes for cover, and Harris went in another direction. After the shooting stopped, Selmon noticed Harris lying face-down on the ground. He walked over to Harris, and Harris said that he could not breathe. Selmon told Harris to get up, but Harris did not move. Selmon turned him over, saw blood coming out of Harris's neck, and realized that Harris had been shot. He put pressure on Harris's neck and stayed with him until an ambulance arrived. Harris remained conscious and repeatedly said that he was having trouble breathing.

Selmon said that he did not know the appellant, that he had never seen the shooter before the incident, and that he would not be able to recognize him. He recalled that the shooter was a dark-skinned, black male, who was approximately five feet and eight or nine inches tall and weighed approximately 185 pounds.

Selmon said that one or two weeks before the shooting, he, Harris, Williams, and Champion attended a pool party at Georgina Parker's house. Near the end of the party, a fight broke out. Selmon and his friends were sitting beside his car, watching the fight but not participating in it. Afterward, Selmon heard rumors that the participants in the fight were

mad at one another.

On cross-examination, Selmon said that he did not see any fights outside when he exited the club.

Kevin Swannigan testified that he graduated from high school in 2005 and that he was friends with Wordlow and Weathersby. One night in June 2004, Weathersby drove Swannigan and Wordlow to Club Flippers. Swannigan said that he saw Champion, Williams, and Selmon in the club and that he spoke with Champion, "but nothing unusual happened." Swannigan said that they talked about the incident at the pool party and tried to "get to the bottom of it." Swannigan thought they had reached an understanding.

Swannigan said that after the club closed, he and Wordlow stood outside the club, talking with friends. A man whom Swannigan did not know approached Wordlow, and they talked. Afterward, Wordlow told Swannigan they were going to the Mapco's parking lot to meet Selmon and Champion to "come to some kind of understanding." Weathersby drove Swannigan and Wordlow across the street and parked in the bank's parking lot. The man who had spoken to Wordlow followed them. After they arrived in the parking lot, the man got out of his car and asked, "[W]hich one is Champ?" Wordlow rolled down the passenger side window and sat on the window sill. Wordlow pointed to Champion, noting that he was holding a "juice". The man began shooting in Champion's direction. Swannigan said that the shooting "spooked us all" and that Weathersby drove away.

Swannigan said that sometime after the shooting, he learned that Champion and Harris had been shot. Over one year later, Harris died from his injuries.

Swannigan said that he was unable to identify the shooter from the photograph lineups he was shown by the police and that he did not see the shooter in the courtroom.

Christopher Williams testified that he graduated from high school in 2004. That summer, he, Selmon, and Harris attended a pool party at Georgina Parker's house. At the end of the party, an altercation occurred; Williams did not know who was involved in the altercation.

Williams said that one or two weeks after the party, Selmon drove Williams, Mosby, Harris, and Champion in his "silver/gray" Dodge Stratus to Club Flippers. They arrived around 9:00 or 10:00 p.m. and parked at the club. When they left the club, they drove across the street, parked in First Tennessee Bank's parking lot, and walked to Mapco. Upon leaving the store, they began walking back to Selmon's car. Williams saw a man standing behind a green Plymouth Breeze that was parked beside Selmon's car. Williams said that a Plymouth

Breeze and a Dodge Stratus looked "[j]ust alike." Williams also saw Weathersby's black Maxima parked on the street. The man standing beside the Plymouth asked, "[A]in't your name Champ," and lifted a handgun. Champion began running toward the gas station, and the man fired one shot. Wordlow, who was in Weathersby's car, said, "[K]eep busting, cuz," and the man continued shooting, firing eight or nine times.

Williams said that after the shooting stopped, he looked around and noticed Harris lying face-down on the ground approximately ten feet away. Williams approached Harris and saw that he had been shot in the neck. Williams removed his shirt and pressed it to Harris's wound. Harris said, "[Y]ou're choking me; I can't breathe." Williams lessened the pressure on the wound to allow Harris to breathe and stayed until the ambulance arrived. Williams later learned that Champion also had been shot. Additionally, Williams learned that Mosby, who was fifteen years old, had a bullet pass through his shirt but was unharmed.

Williams said that while he was still at the parking lot, Wordlow called him "out of the blue and said [he] didn't have nothing to do with that." Williams responded, "I know you had something to do with it. Don't call me no more." Williams then hung up on Wordlow.

Memphis Police Officer James Butler testified that on the night of the shooting, he and Officer Andy Dupree were dispatched to the area around Club Flippers because of a report of shots fired. By the time Officers Butler and Dupree arrived at 12:36 a.m., an off-duty officer was already there. The scene was "chaotic" with "lots of people running around." One of the shooting victims was lying on the ground in the bank's parking lot, critically injured and paralyzed from the neck down. Another victim, who had been "shot in the lower extremity," was at Mapco. Officer Butler secured the scene, spoke with witnesses, and turned the case over to the investigative unit.

On cross-examination, Officer Butler said that several other officers arrived around the same time or shortly after he did. He estimated that twenty people were milling about the bank's and gas station's parking lots.

Officer Andre Muhammad testified that on the night of the shooting, he heard the report of shots fired in the area around Club Flippers. He was off duty, but he responded to the scene and parked at the bank. A couple of boys were in the parking lot, crouched over another boy who was lying on the ground. Officer Muhammad approached and saw that one of the boys was bleeding from a gunshot wound to the left side of his neck. He learned that another shooting victim had gone inside Mapco. Officer Muhammad went inside the store and found that the victim had been shot in the middle of his lower back.

Officer Muhammad said that the victim was lying on the ground in the bank's parking

-9-

lot and was surrounded by a puddle of blood. A spent shell casing was lying in the blood.

On cross-examination, Officer Muhammad said that the scene "was not chaotic in the sense that [there were] a lot of people, a lot of pedestrians." He thought he saw ten to twelve people at the scene.

Major Stanley Johnson testified that in the early morning hours of June 13, 2004, he began assisting in the investigation of the shooting. He arrived at the scene at approximately 2:13 a.m.; the victims had already been transported to the hospital. In the bank's parking lot, he found one spent round in a puddle of blood. He also found in the driveway of the bank eight shell casings that had been ejected from a semi-automatic weapon.

On cross-examination, Major Johnson said that the casings were identified as .9 millimeter shells.

Dr. Kenneth Snell testified that he performed the autopsy on Harris's body. He said that Harris was shot in the neck; the bullet passed through the sixth cervical vertebra, resulting in paralysis from the neck down. As a result of the paralysis, Harris developed complications such as skin ulcerations, bacteremia, septicemia, and pneumonia. Dr. Snell said that septecemia and pneumonia were the immediate causes of Harris's death. He explained, however, that "[h]ad it not been for the gunshot wound, we would not have these complications and he wouldn't be dying from these complications."

The appellant testified that in the early morning hours of June 13, 2004, he was at home with his thirteen-month-old daughter. His daughter's mother was Lashanda Stokes. The appellant acknowledged that he and Ms. Stokes drove a dark green Plymouth Breeze but said that he did not drive the car on the night of the shooting.

The appellant asserted that he had never been to Club Flippers and that he was not responsible for killing Harris or injuring Champion. He stated that he did not know the victims and had never heard their names until he was arrested at his home for his involvement in the shooting. He said that the police never attempted to interview him.

The appellant said that he moved to Memphis in June 2003 and that he first met Wordlow, who was a friend of Ms. Stokes's younger brother, approximately two weeks later. Wordlow moved in with the appellant sometime around May and June 2005.

On cross-examination, the appellant acknowledged that it was a "six-minute trip" from his house to Club Flippers.

Lashanda Stokes testified that on the night of June 12, 2004, she drove her Plymouth Breeze to work. Along the way, she dropped off the appellant and the baby at her parents' house so they could watch television while she was at work. After work, Ms. Stokes went to her parents' house between 12:30 and 12:45 a.m.; the appellant and the baby were still there.

On cross-examination, Ms. Stokes acknowledged that she testified at a previous proceeding that she left her parents' house around 12:15 or 12:20 a.m. and went home. She said that the times to which she had previously testified were incorrect and that her trial testimony was correct. Ms. Stokes further acknowledged that in her previous testimony, she did not mention the appellant's being at her parents' house but explained that she was not asked. She said that she told the appellant's defense counsel that the appellant had an alibi but that she did not tell the police or the prosecution. Ms. Stokes said that her Plymouth Breeze was light green in color. The appellant had a Cadillac that was not working at the time.

Willie Stokes, Ms. Stokes's father, testified that in 2004, the appellant worked in Mr. Stokes's construction business. He recalled that on June 12, 2004, the appellant had to take care of the baby while Ms. Stokes was at work because everyone else in the family was away or busy. In particular, Mr. Stokes said that he and his wife were spending the night in the French Quarter as an anniversary present from their children.

Dr. Jeffrey Neuschatz testified as an expert in the field of eyewitness identification. Dr. Neuschatz explained that "memory is an amalgamation of all the information we've collected and what we've thought about the event and how we've edited our memories to make sense and how we know the world works." He asserted that a thirteen-month interval between an event and the identification of a perpetrator would negatively impact eyewitness identification, noting that "things can happen to you during that time that either makes you remember the information inaccurately or helps you forget the information." He said that stress also tended to reduce the reliability of memory, including identification. He noted a study indicating that in situations where a weapon was present, people remembered the weapon and the shooting "better than other aspects of the scene." Dr. Neuschatz said that the most important factor in making an accurate identification was "[b]eing able to see the person that you're identifying, being able to see their face." Dr. Neuschatz asserted that the events of the instant case, namely the length of the incident, the late-night hour of the events, and the involvement of gunfire, were not "conducive to an accurate identification 13 months later."

On cross-examination, Dr. Neuschatz said that he was a psychologist. He clarified that he was not testifying that people in stressful situations could never make an accurate

-11-

identification, acknowledging that "there are studies that also show that people in stressful situations do make correct identifications." However, he gave the following caveat, "the studies they talk about, people do make correct identifications, but less frequently than they make incorrect identifications." Dr. Neuschatz acknowledged that a person could make a more accurate identification if he or she knew the person being identified.

At the conclusion of the trial, the jury found the appellant guilty of the first degree premeditated murder of Harris and the attempted first degree murder of Champion. The trial court imposed concurrent sentences of life imprisonment for the first degree murder conviction and twenty-five years for the attempted first degree murder conviction. On appeal, the appellant challenges the sufficiency of the evidence sustaining his convictions and contends that the trial court erred by denying his motion for a mistrial.

## II.  Analysis

A.  Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

First degree premeditated murder is defined as the "premeditated and intentional

killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; and (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See id. at 914-15; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

On appeal, the appellant maintains that the testimony of Swannigan and Weathersby was "shaky" and that Wordlow and Weathersby "had every motive to lie regarding their actions in this case and to deflect the suspicion onto someone else." The appellant asserts that Dr. Neuschatz's testimony supports his claim that the eyewitness identification of him was unreliable. In sum, the appellant challenges the credibility of Wordlow and Weathersby

and contends that the eyewitness identification is unreliable, particularly in light of his alibi. In response, the State contends that Weathersby and Wordlow clearly saw and accurately identified the appellant as the shooter, that additional witnesses testified that the shooter's car looked like a car the appellant was driving, and that the State amply proved the appellant's guilt. We agree with the State.

Initially, we note that determining the credibility of witnesses is within the purview of the jury, not this court. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000).

In the light most favorable to the State, the proof at trial revealed that two weeks prior to the shooting, Wordlow and Champion attended a pool party. During the party, a fight occurred. Wordlow was hit, and he thought Champion was responsible. The appellant, whom Wordlow referred to as a "brother," knew about the incident. After the party, Wordlow and Champion were not fighting but "there was a little bit of something going on between" them. On the night of the shooting, Champion, Selmon, Williams, Wordlow, Swannigan, Mosby, and Harris went to Club Flippers. As they were leaving, Wordlow saw the appellant in the club's parking lot, and the appellant asked Wordlow to identify Champion. After Wordlow pointed out Champion, the appellant drew a handgun and fired as many as ten shots toward Champion, who was unarmed. Champion was struck in the back and underwent two surgeries for injuries to his lung and liver. Harris, who was also unarmed, was shot in the neck and was paralyzed from the neck down. Weathersby and Wordlow positively identified the appellant as the shooter, saying that the appellant was standing beside a green Dodge Stratus and that he repeatedly fired in the direction of Mapco. Williams saw the shooter standing beside a green Plymouth Breeze, which looked the same as a Dodge Stratus. The appellant acknowledged that he and Stokes had a green Plymouth Breeze. Wordlow said that after the shooting, the appellant acknowledged shooting Champion because Champion "had got smart with him." Thirteen months after the shooting, Harris died as a result of the complications of his paralysis. Based upon the foregoing, we conclude that a reasonable jury could have found beyond a reasonable doubt that the appellant was guilty of the first degree murder of Harris and the attempted first degree murder of Champion.

## B. Mistrial

The appellant next contends that the trial court erred by denying his motion for a mistrial. The appellant contends that the State's attempt to impeach him by questioning his

failure to inform the police of his alibi violated his right to a fair trial under the Fourteenth Amendment of the United States Constitution. The State maintains that the appellant did not request a mistrial and that the trial court corrected any error by giving a curative instruction.

During the State's cross-examination of the appellant, the prosecutor asked him, "When did you call the Homicide Bureau of the police department and tell them about your alibi?" Defense counsel objected, and a jury-out hearing was held. Defense counsel said:

> I feel like I'm being badgered into asking for a mistrial. We're in a place right now where I think our case is in a good place, but I think the State's moving to a place that's so inappropriate that I'm going to be forced to ask for a mistrial with those kind of questions.

The State responded that "[t]here [is] nothing inappropriate with asking a witness why and when he told somebody about the alibi."

The trial court sustained defense counsel's objection and admonished the State:

> It's not at this point character. The [appellant] has no duty to do anything, to say anything, to call the police, to testify, to do anything. And saying when did you call the police, when did you do anything to tell them after you'd been arrested about what happened. And you know that's inappropriate. You know that's improper.
>
> And this is the second time we've tried this case and I am determined it's going to be tried correctly. And this is – this is just attack, attack, attack this man instead of asking appropriate questions. And it's not going to happen anymore. I mean, smear him, smear him instead of asking appropriate questions.
>
> . . . .
>
> [P]ut on an officer [to testify that the police] were never given any information about an alibi. Whatever. It's not appropriate to ask the defendant.

The trial court ordered the State to abandon that line of questioning. Before the jury was brought back in the courtroom, defense counsel said, "Judge, in an abundance of caution,

I just for the record ask for a curative on that. On the last question. I mean, the bell's rung."

The trial court agreed and gave the following curative instruction:

> Before we recessed, there was a question asked regarding why [the appellant] didn't call the police about any information he may have had about this case. And I'm instructing you at this point that [the appellant] never had any obligation to provide the police with any information. He has always had a 5th amendment right to remain silent and had no obligation to call the police about anything. So you're not to hold that against him in this case.

A mistrial is a procedural device that is only appropriate when the trial cannot continue without causing a miscarriage of justice. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). In other words, there must be a "manifest necessity" for a mistrial to be declared. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). The party seeking the mistrial has the burden of establishing the necessity of granting the mistrial. State v. Banks, 271 S.W.3d 90, 137 (Tenn. 2008). In conducting our review of this issue, we note that this court has previously found that "[t]he decision of whether to grant a mistrial is within the sound discretion of the trial court. This court will not disturb that decision absent a finding of abuse of discretion." State v. Mathis, 969 S.W.2d 418, 422 (Tenn. Crim. App. 1997) (citation omitted).

Initially, we note that the State correctly asserts that the appellant did not move for a mistrial. In response to the State's questions, the appellant's counsel objected and said that the State's questioning might force him to request a mistrial; however, such a request was never made. Instead of requesting a mistrial, defense counsel asked for a curative instruction. The trial court sustained the objection and gave the curative instruction. See State v. Thomas Lee Hutchison, No. E2012-02671-CCA-R3-CD, 2014 Tenn. Crim. App. LEXIS 346, at *98-99 (Knoxville, Apr. 11, 2014), perm. to appeal granted, (Tenn., Oct. 20, 2014). The appellant appeared to be satisfied with the instruction. Therefore, we conclude that the appellant has waived this issue. See Tenn. R. App. P. 36(a).

Nevertheless, we note that the trial court's statements indicated that the State's line of questioning deserved admonishment and a curative instruction but did not warrant a mistrial. We agree and conclude that the trial court did not abuse its discretion by giving a curative instruction, not granting a mistrial.

### III. Conclusion

In sum, we conclude that the evidence was sufficient to sustain the appellant's convictions and that the court did not err by failing to grant a mistrial. Accordingly, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE